UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LUCINDA COX, MARTY MILLS, DEVIN HARLEY, and ROBERT BROWN, *individually and on behalf of others similarly situated*, Plaintiffs, | ) ) ) ) | 1:13-cv-01754-JMS-TAB |
| | ) | |
| *vs.* | ) ) | |
| | ) | |
| CA HOLDING INC., KRG CAPITAL MANAGEMENT LP, CACH LLC, CACH OF NJ LLC, SQUARE TWO FINANCIAL CORPORATION, PHILLIP SCOTT LOWERY, PAUL A. LARKINS, L. HEATH SAMPSON, BRIAN W. TUITE, JAMES B. RICHARDSON, JR., THOMAS S. GOOD, MARK M. KING, CHRISTOPHER J. LANE, DAMON S. JUDD, and JOHN DOES 1-50, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | |

**ORDER**

Presently pending before the Court is a Joint Motion to Compel Arbitration and Stay

Proceedings Pending the Completion of Arbitration, filed by Defendants CA Holding Inc. ("CA"),

KRG Capital Management LP ("KRG"), CACH LLC ("CACH"), CACH of NJ LLC ("CACH

NJ"), Phillip Scott Lowery, Paul A. Larkins, and Christopher J. Lane.[1]  [Filing No. 34.]  The

---

[1] While the motion states that it is made by these Defendants, the remaining Defendants – SquareTwo Financial Corporation, L. Heath Sampson, Brian Tuite, James Richardson, Jr., Thomas Good, Mark King, and Damon Judd – appear to join in the motion.  Their counsel has signed the motion on their behalf, [Filing No. 34 at 2-3], and the brief in support of the motion states that "through their respective undersigned counsel Defendants SquareTwo Financial Corporation, Thomas G. Good, L. Heath Sampson, Brian W. Tuite, and James B. Richardson, Jr. and Defendants Mark M. King and Damon S. Judd join in this memorandum." [Filing No. 53 at 1.]  Accordingly, the Court will treat the motion as one made on behalf of all Defendants.

1

motion applies to all claims brought by Plaintiffs Lucinda Cox, Marty Mills, Devin Hartley,[2] and Robert Brown.

## I.
### STANDARD OF REVIEW

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA") provides that arbitration provisions in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[F]ederal law places arbitration clauses on equal footing with other contracts, not above them." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 740 (7th Cir. 2010). While parties seeking to compel arbitration often cite a federal "policy" in favor of arbitration, any preference for arbitration is "reserved for the interpretation of the scope of a valid arbitration clause." *Id.*

"An agreement to arbitrate is treated like any other contract." *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997) (citing *Kresock v. Bankers Trust Co.*, 21 F.3d 176, 178 (7th Cir. 1994)). Arbitration will only be compelled where there is a contract providing so. *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 (7th Cir. 1995). "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *see also General Ass'n of Regular Baptist Churches v. Scott*, 549 Fed. Appx. 531, 533 (7th Cir. 2013).

---

[2] The caption of the Complaint lists Plaintiff Devin Hartley as "Devin Harley," but the parties use the last name "Hartley" in their briefs, and the relevant documents list the last name as "Hartley." The Court assumes the caption contains a typo, and instructs the Clerk to change the last name from "Harley" to "Hartley" on the case docket.

In order to determine whether a valid arbitration agreement exists, a federal court looks to the state law governing the formation of the contract. *Baumann v. Finish Line, Inc.*, 421 Fed. Appx. 632, 634 (7th Cir. 2011) ("An agreement to arbitrate is treated like any other contract, and we look to the state law that governs the formation of contracts to determine if there was a valid agreement") (citing *Tinder v. Pinkerton Security*, 305 F.3d 728, 733 (7th Cir. 2002)); *Gibson*, 121 F.3d at 1130; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Because it appears that the parties agree regarding the application of Indiana law to Ms. Cox's and Mr. Brown's arbitration provisions,[3] and of Utah law to Mr. Mills' and Mr. Hartley's arbitration provisions,[4] the Court will apply those laws accordingly. *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998); *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits....*Courts do not worry about conflict of laws unless the parties disagree on which state's law applies*. We are busy enough without creating issues that are unlikely to affect the outcome of the case (if they were likely to affect the outcome the parties would be likely to contest them)") (emphasis added). Under both Indiana and Utah law, the burden of demonstrating the existence of an enforceable arbitration agreement is on the party seeking to compel arbitration. *Wilson Fertilizer & Grain, Inc. v. ADM Mill. Co.*, 654 N.E.2d 848, 849 (Ind. Ct. App. 1995); *McCoy v.*

---

[3] Defendants contend Indiana law applies to Mr. Brown's arbitration provision, and cite Indiana law when discussing Ms. Cox's arbitration provision, [*see* Filing No. 53 at 9], and Plaintiffs do not argue otherwise, [*see* Filing No. 73].

[4] Defendants argue that Utah law applies to the arbitration provisions applicable to Mr. Mills and Mr. Hartley based on choice of law provisions in their cardholder agreements, [*see* Filing No. 53 at 7], and Plaintiffs do not address the issue, [*see* Filing No. 73].

*Blue Cross and Blue Shield of Utah*, 20 P.3d 901, 904 (Utah 2001) (party seeking to compel arbitration has the burden of showing the existence of an agreement to arbitrate).

Once it is established that there is a valid arbitration agreement, the party opposing arbitration must "identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder*, 305 F.3d at 735.  Similar to opposing summary judgment, the party opposing arbitration "cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.*  In deciding whether the party opposing compelled arbitration has identified a genuine issue of material fact, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Id.* (citations and quotations omitted).  The ultimate issue is whether the plaintiff has "produced sufficient evidence to raise a factual issue concerning whether [plaintiff and defendant] are bound by a contract to arbitrate." *Id.*  "[I]f the parties have an arbitration agreement and the asserted claims are within its scope, the motion to compel cannot be denied." *Sharif v. Wellness Intern. Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999)).

## II.
### BACKGROUND

**A.  The Plaintiffs' Accounts, Governing Documents, and Defendants' Involvement**

Both sides have submitted significant documentary evidence to support their positions, and a detailed summary of those documents, and Defendants' involvement with each of the Plaintiff's accounts, is required to determine whether Defendants are entitled to arbitrate each Plaintiff's claim.

1. *Lucinda Cox*

    a. <u>Credit Agreement Documents</u>

On October 16, 2002, Ms. Cox signed a one-page document titled "Kittle's Furniture Card Program" (the "<u>Cox Application</u>"). [<u>Filing No. 48-6 at 37</u>.] The Cox Application states:

> By completing and signing this application, you request a Card issued to you by us which will allow you to make purchases under this Account. By a) signing, using or permitting others to use this Card; b) signing or permitting others to sign sales slips; c) making or permitting others to make purchases by telephone, internet, or any other means, you agree to the terms and conditions of this Cardholder Agreement and Disclosure Statement…. (which includes an arbitration provision) stated on both sides of this combined application and Cardholder Agreement and Disclosure Statement, which are incorporated herein by reference. You have read and received a copy of your Agreement before making any purchase under this Account. Terms are attached.

[<u>Filing No. 48-6 at 37</u>.] The Cox Application identifies Household Bank (SB), N.A. ("<u>Household</u>") as the company issuing the credit card. [<u>Filing No. 48-6 at 37</u>.]

    b. <u>Chain of Ownership Documents</u>

A Purchase Agreement between HSBC Bank Nevada, N.A. ("<u>HSBC Nevada</u>") and HSBC Receivables Acquisition Corporation (USA) IV as the sellers, and CACH as the purchaser (the "<u>HSBC Purchase Agreement</u>") governs the purchase of "certain credit card accounts and receivable balances…for the term of this Agreement…outstanding under Cardholder Accounts that constitute Charged-Off Receivables…together with all amounts that may thereafter become due under Cardholder Accounts with respect to such balances as additional interest, late fees, rights to recover collection expenses or other charges; and including all rights of Seller to receive or benefit from payments or proceeds from credit life insurance in which such Cardholder has an interest…." [<u>Filing No. 48-6 at 2</u>.] HSBC Nevada is formerly known as Household. [*See* <u>Filing No. 81-7 at 2</u> (Federal Deposit Insurance Corporation document reflecting that Household changed its name to HSBC Nevada on March 1, 2005).]

The HSBC Purchase Agreement provides that the sellers agree to "sell, convey, transfer and assign to Purchaser and Purchaser agrees to purchase from Seller…all right, title, and interest of Seller in and to Purchased Accounts and Purchased Receivables." [Filing No. 48-6 at 4.] The HSBC Purchase Agreement contains an exhibit listing Ms. Cox's account as one covered by the HSBC Purchase Agreement. [Filing No. 48-6 at 32.] The HSBC Purchase Agreement is binding on the parties and their "respective successors and permitted assigns." [Filing No. 48-6 at 20.]

      c.   <u>Ms. Cox's Allegations</u>

Ms. Cox alleges that HSBC Nevada sent her collection letters and called her "regarding an alleged debt purchased by Defendants from [HSBC Nevada]," and that "[d]espite her numerous written and telephonic requests for validation of the Defendants' ownership of an alleged debt, Defendants were unable to produce any documentation showing Defendants' purchase of the alleged debt, but continued to contact [her]." [Filing No. 1 at 5.]

      *2. Marty Mills*

      a.   <u>Credit Agreement Documents</u>

In support of their motion, Defendants submitted a GE Capital Retail Bank Credit Card Account Agreement (the "<u>Mills Agreement</u>"), which is unsigned and undated, and provides that:

> Upon demand, and except as otherwise provided below, you and we must arbitrate individually any dispute or claim between you, any joint cardholder and/or any additional cardholder, on the one hand; and us, our affiliates, agents and/or dealers/merchants/retailers or participating professionals, on the other hand, if the dispute or claim arises from or relates to your account. However, we will not require you to arbitrate: (1) any individual case in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) any claim by us that only involves our effort to collect money you owe us. However, if you respond to a collection lawsuit by claiming that we engaged in any wrongdoing, we may require you to arbitrate.

[Filing No. 48-5 at 49.]

b.  Chain of Ownership Documents

A Forward Flow Receivables Purchase Agreement dated October 8, 2010 between General Electric Capital Corporation ("GECC") and GE Money Bank as the sellers, and CACH as the purchaser (the "GE Purchase Agreement") covers the sale of "delinquent credit card receivables." [Filing No. 48-5 at 3.]  It provides that "[o]n each Funding Date, Seller shall sell and Buyer shall buy all right, title and interest in and to the Receivables with respect to which Buyer has received a Notification File, without recourse and without warranty of any kind…except as specifically set forth herein…."  [Filing No. 48-5 at 5.]  The GE Purchase Agreement contains an exhibit which lists Mr. Mills' account as one covered by the GE Purchase Agreement.  [Filing No. 48-5 at 35.]

A Second Amendment to the GE Purchase Agreement (the "Second Amendment") added several parties as sellers, including GE Capital Retail Bank, but does not list GE Money Bank – the party to the Mills Agreement – as a seller.  [Filing No. 73-3 at 32-37.]  The Second Amendment is dated December 20, 2011.  [Filing No. 73-3 at 32.]

c.  Mr. Mills' Allegations

Mr. Mills alleges that Defendants "used a non-licensed collection agent law firm to file a Complaint in Johnson County based on [his] former address," that he "had no knowledge of the Defendants, nor the Complaint, until the Default Judgment and Complaint were mailed to his actual address in Marion County," and that "[t]he alleged ownership of a GE Money Retail Bank credit card is supported by only a fill-in-the-blank, robo-signed affidavit signed by an alleged 'authorized representative' of CACH with no knowledge of GE Money Retail Bank's business records."  [Filing No. 1 at 5-6.]

3. *Devin Hartley*

a. Credit Agreement Documents

A GE Money Bank Credit Card Agreement (the "Hartley Agreement"), which is undated and signed only by a GE Money Bank representative, provides that "any past, present or future legal dispute or claim of any kind, including statutory and common law claims and claims for equitable relief, that relates in any way to your account, card or your relationship with us…will be resolved by binding arbitration if either you or we elect to arbitrate." [Filing No. 48-3 at 46.] The Hartley Agreement contains a Utah choice of law provision. [Filing No. 48-3 at 43.] The Hartley Agreement is effective the date that an approved account application is submitted, or the date that the card user (or someone authorized) uses the account, whichever is earlier. [Filing No. 48-3 at 44.]

b. Chain of Ownership Documents

The Defendants submit the GE Purchase Agreement in support of their argument that they are entitled to enforce the arbitration provision in the Hartley Agreement. [Filing No. 48-3 at 2-42.] The GE Purchase Agreement contains an exhibit listing Mr. Hartley's account as an account covered by the GE Purchase Agreement. [Filing No. 48-3 at 32.]

c. Mr. Hartley's Allegations

Mr. Hartley alleges that Defendants "used a non-licensed collection agent law firm to file a Complaint in Hamilton County despite supplying the court with a Johnson County address," that "[t]he alleged ownership of…Care Credit/GE Money Bank is supported by an identical fill-in-the-blank, robo-signed affidavit signed by an alleged 'authorized representative' of CACH with no knowledge of GE Money's business records or how the account went from Care Credit to GE Money," and that "[t]here is also appended a single page from the purchase agreement attesting to

ownership while omitting the more than 30 additional pages where…GE Money disclaims the lack of evidence." [Filing No. 1 at 6.]

    *4. Robert Brown*

    a. <u>Credit Agreement Documents</u>

Mr. Brown signed a Personal Credit Line Account Agreement on January 2, 2003 which governed credit issued by Beneficial Indiana Inc. ("<u>Beneficial Indiana</u>") (the "<u>Brown Agreement</u>"). [Filing No. 48-4 at 32-36.] It provides that "[t]he terms of the Arbitration Agreement and any other Riders signed as part of this loan transaction are incorporated into this Agreement by reference." [Filing No. 48-4 at 35.] An Arbitration Rider provides that:

> [E]ither Lender or you may request that any claim, dispute, or controversy…, including initial claims, counterclaims, and third party claims, arising from or relating to this Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire Agreement…, shall be resolved, upon the election of you or us, by binding arbitration pursuant to this arbitration provision and the applicable rules or procedures of the arbitration administrator selected at the time the Claim is filed.

[Filing No. 48-4 at 30.]

    b. <u>Chain of Ownership Documents</u>

An Account Purchase and Sale Agreement between HSBC Consumer Lending (USA) Inc. on behalf of and as managing company for Beneficial Company LLC and HFC Company LLC and their respective subsidiaries as sellers, and CACH as purchaser (the "<u>Beneficial Account Purchase Agreement</u>") provides that the seller will "sell, convey, transfer and assign to Purchaser and Purchaser agrees to purchase from Seller…all right, title, interest and obligations of Seller in and to the Accounts." [Filing No. 48-4 at 4.] "Accounts" is defined as "each unsecured consumer loan including the Unpaid Balance thereon…." [Filing No. 48-4 at 2.] Beneficial Indiana – the party to the Brown Agreement – and HSBC Consumer Lending (USA) Inc. are both subsidiaries

of HSBC Finance Corporation.  [Filing No. 81-5.]  The Beneficial Account Purchase Agreement contains an exhibit listing an account owned by Mr. Brown as covered by the Beneficial Account Purchase Agreement.  [Filing No. 48-4 at 26.]

### c. Mr. Brown's Allegations

Mr. Brown alleges that Defendants "used an unlicensed collection agency to send a dunning letter claiming CACH to be the creditor for an HSBC Consumer Lending USA Inc. account," and that he was "forced to hire legal counsel to contest the unlawful collection activity." [Filing No. 1 at 6-7.]

### B. The Lawsuit

On November 4, 2013, Plaintiffs filed a Class Action Complaint Seeking Declaratory and Equitable Relief as Well as Actual and Statutory Damages and Disgorgement of Funds with Jury Demand.  [Filing No. 1.]  Plaintiffs summarize their lawsuit as "aris[ing] out of Defendants' actionable conduct in connection with a collection scheme they created to fraudulently manipulate consumers into paying money on alleged obligations owed Defendants when the consumers did not actually owe Defendants the money….Defendants and their agents have engaged in fraudulent collection activity by impermissibly pulling credit reports, performing manual and automated outbound dialer calling activity, sending dunning letters, and filing lawsuits against Indiana residents, while having no legal ownership of a debt."  [Filing No. 1 at 2-3.]

Plaintiffs assert the following claims: (1) failure to obtain a debt collection license as mandated by Indiana Code § 25-11-1-7 in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. ("FDCPA"), [Filing No. 1 at 26-29]; (2) failure to obtain a registration mandated by Indiana law in violation of the FDCPA, [Filing No. 1 at 29-30]; (3) failure to actually own the debt in violation of the FDCPA, [Filing No. 1 at 30-31]; (4) common law fraud, [Filing

No. 1 at 31-33]; (5) restitution, [Filing No. 1 at 33-34]; (6) unjust enrichment, [Filing No. 1 at 34-36]; (7) acquisition and maintenance of an interest in and control of an enterprise engaged in a pattern of racketeering activity, in violation of the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), [Filing No. 1 at 36-38]; (8) conduct and participation in a RICO enterprise through a pattern of racketeering activity, [Filing No. 1 at 39-45]; and (9) conspiracy to engage in a pattern of racketeering activity, [Filing No. 1 at 45-50].

The Plaintiffs bring their claims on behalf of three subclasses:

a. The FDCPA Subclass consists of: (i) all Indiana citizens; (ii) who were the subject of collection activity by the Defendants; (iii) in an attempt to collect a debt incurred for personal, family, or household purposes; (iv) which were served with process or contacted in any matter by Defendants; (v) during the one year period prior to the filing of this original complaint in this action through trial of this cause which are in violation of the FDCPA.

b. The Restitution Subclass consists of: (i) all Indiana citizens; (ii) who paid money to Defendants; (iii) in regard to an alleged debt owed to Defendants; (iv) during the six year period prior to the filing of the original complaint in this action through the trial of this cause.

c. The Rico Subclass consists of: (i) all Indiana citizens; (ii) who paid money to Defendants; (iii) under Defendants' scheme to defraud; (iv) using the mail or wires; (v) during the four year period prior to the filing of the original complaint in this action through the trial of this cause.

[Filing No. 1 at 24.]

The pending motion requests that the Court find Defendants are entitled to arbitrate Plaintiffs' claims against them, and that this action be stayed until arbitration concludes. [Filing No. 34.] In short, Defendants argue that Mr. Mills and Mr. Hartley opened accounts with "GE", Ms. Cox and Mr. Brown opened accounts with "HSBC", and all of those accounts are subject to an arbitration agreement. [Filing No. 34 at 1.] Plaintiffs respond, in sum, that Defendants cannot prove they are a rightful party to any agreements which contain arbitration provisions and so are

11

not entitled to enforce the terms of those agreements, and that Defendants have not shown that the terms of any arbitration provisions would apply to Plaintiffs' claims. [Filing No. 73 at 1.]

### III.
#### DISCUSSION

The Court is compelled to note that its review of Defendants' motion has been unnecessarily burdensome, through the fault of both Plaintiffs and Defendants. Plaintiffs, on the one hand, have each asserted claims that have no apparent relationship to each other. They each sue based on different credit agreements and different purchase agreements that involve different Defendants. As discussed in more detail below, the Court questions whether Plaintiffs can even properly join their claims in one lawsuit. Their pursuit of these claims together has made analyzing the documents that govern their claims overly complicated.

Defendants, on the other hand, have produced insufficient evidence on several issues, and have left the Court to wonder which documents govern certain Plaintiffs' claims. This is especially curious given that these documents ought to be within Defendants' control. While the Court afforded Defendants a chance to supplement their briefing, the additional briefing did not clarify all of the outstanding issues, as discussed below. In short, the Court expects better of Defendants' counsel.

#### A. Admissibility of Documents

Plaintiffs argue in response to the motion that numerous documents Defendants rely upon are inadmissible. The Court must determine this issue at the outset, as the issues raised by the motion depend almost entirely on this documentary evidence. Plaintiffs assert that the Declaration of Christie Coston, [Filing No. 48-1] – the custodian of record for CACH – is not sufficient to authenticate records that were not created or maintained by CACH. [Filing No. 73 at 23-24.] Plaintiffs argue that in order for the non-CACH records to be admissible, "CACH would have had

to have a records custodian from the business that created the document to lay the foundation to establish the business records exception applies to the particular exhibit," and states that "[Ms.] Coston is not qualified to testify as to third parties' business processes, and so CACH has failed to satisfy its burden of the requisite foundation for admission under FRCP 803(6). As such all of the group exhibits included with [Ms.] Coston's declaration are inadmissible hearsay." [Filing No. 73 at 25.] Plaintiffs specifically identify the following documents as inadmissible for failure to satisfy the business records exception to the hearsay rule:

· The Cox Application, [Filing No. 48-6 at 37];

· The pages of the HSBC Purchase Agreement reflecting Ms. Cox's account, [Filing No. 48-6 at 32-36];

· The Mills Agreement, [Filing No. 48-5 at 47-50];

· The pages of the GE Purchase Agreement reflecting Mr. Mills' account, [Filing No. 48-5 at 35-44];

· The Hartley Agreement, [Filing No. 48-3 at 43-46];

· The pages of the GE Purchase Agreement reflecting Mr. Hartley's account, [Filing No. 48-3 at 33-42];

· The Brown Agreement, [Filing No. 48-4 at 32-36]; and

· The pages of the Beneficial Account Purchase Agreement reflecting Mr. Brown's account, [Filing No. 48-4 at 26-29].

Defendants respond that the documents are admissible because CACH incorporated the records at issue – which they admit came from third parties – into its own records and "thereafter relied upon [those] records in its business practices." [Filing No. 81 at 8.] They also assert that Plaintiffs do not claim the documents are untrustworthy, and that Ms. Coston's affidavit establishes they are reliable. [Filing No. 81 at 9.]

Federal Rule of Evidence 803(6) provides that documents are not excluded by the rule against hearsay where they constitute:

> A record of an act, event, condition, opinion, or diagnosis if…(A) the record was made at or near the time by – or from information transmitted by – someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

In her Declaration, Ms. Coston states that she is the custodian of records for CACH and is "knowledgeable about how CACH maintains and oversees the retail installment agreements, credit card agreements, loan agreements, terms and conditions governing each account, other agreements relating to each account, debt collection records, account purchase and transfer information, and other account information pertinent to accounts and debts that CACH[] purchases and sells." [Filing No. 48-1 at 2.] She testifies further that the business records she has reviewed "were made by, or from information transmitted by, a person with knowledge of the events described therein, at or near the time of the event described, and which are kept in the ordinary course of the regularly conducted business activity of such person and CACH, and for which it is the regular practice of that business activity to make such records." [Filing No. 48-1 at 3.] She states that "[s]ome of the business records I reviewed…were created or partially created by businesses other than CACH," and "[t]hese records have been incorporated into the business records of CACH, and are relied upon by CACH in conducting its business." [Filing No. 48-1 at 3.]

While it does not appear that the Seventh Circuit Court of Appeals has dealt with the admissibility of third-party documents under the business records exception in this context, several other circuit and district courts have held that the custodian of records for the company relying

upon another company's business records as part of a business transaction can authenticate those records as part of its own business records. *See, e.g.*, *Air Land Forwarders, Inc. v. U.S.*, 172 F.3d 1338, 1342 (Fed. Cir. 1999) (testimony from witness with first-hand knowledge regarding original preparation of documents not necessary where "an organization incorporated the records of another entity into its own, relied upon those records in its day-to-day operations, and where there are other strong indicia of reliability"); *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (same principle); *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992) ("Even if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity"); *Cage v. Cach, LLC*, 2014 WL 2170431, *3 (W.D. Wash. 2014) (finding that declaration of Ms. Coston in a similar case provided adequate foundation for records showing the assignment of plaintiff's accounts to defendants, and stating "[a]lthough some of the records were originally created by businesses other than CACH, 'records a business receives from others are admissible under Federal Rule of Evidence 803(6) when those records are kept in the regular course of business, relied upon by that business, and where that business has a substantial interest in the accuracy of the records'") (quoting *MRT Construction Inc. v. Hardrives*, 158 F.3d 478, 483 (9th Cir. 1998)).

The Court finds that Ms. Coston's Declaration is sufficient to authenticate the non-CACH documents under the business records exception. In addition to testifying regarding her knowledge of CACH's recordkeeping, Ms. Coston states that the third-party records "have been incorporated into the business records of CACH, and are relied upon by CACH in conducting its business." [Filing No. 48-1 at 3.] This is enough to meet the business records hearsay exception set forth in Fed. R. Ev. 803(6). *See FirstMerit Bank, N.A. v. Balin*, 2012 WL 4017948, *3 (N.D. Ill. 2012) ("[A]lthough [the declarant] did not work for [the third party] and was not a custodian of [the third

party's] records, [the declarant] would constitute a qualified witness since the records of [the third

party] became [the defendant's] records as the successor bank").  Further, the Court notes that

Plaintiffs' only dispute regarding the reliability or trustworthiness of the documents is that Ms.

Coston identifies certain entities collectively, which "increases the untrustworthiness and

unreliability" of the documents at issue.  [Filing No. 73 at 27.]  Plaintiffs fail to adequately explain

how these collective references lead to the conclusion that the documents are unreliable or not

trustworthy, and the Court does not find these collective references problematic.  Indeed, the Court

notes that CACH found the documents to be trustworthy enough to sue Mr. Hartley and Mr. Mills

in Indiana state court based on some of the documents about which Plaintiffs complain.  [*See* Filing

No. 73 at 23.][5]

Having determined that the documents in question are admissible, the Court will consider

whether the documents support compelling arbitration of Plaintiffs' claims.

---

[5] The Court is aware that some district courts within the Seventh Circuit have held that while a
third-party document can qualify as a defendant's business records where the defendant
"integrated the third-party document into its records and relied upon it in its day-to-day
operations," the defendant must also demonstrate that the third-party "kept the [document] in the
course of its regularly conducted business activity and created such reports on a regular basis."
*Cunningham Charter Corp. v. Learjet, Inc.*, 2012 WL 1565532, *3 (S.D. Ill. 2012). *See also* *Webb
v. Midland Credit Management, Inc.*, 2012 WL 2022013, *4 (N.D. Ill. 2012).  Determining
admissibility is fact-specific, and the Court finds that in this case, the documents are reliable and
trustworthy and are properly considered as incorporated into CACH's admissible business records.
*See* *FirstMerit Bank, N.A.*, 2012 WL 4017948 at *3 ("[A] district court has discretion in assessing
the ultimate trustworthiness of a document that contains hearsay," and "Defendants have failed to
present any evidence other than their unsupported personal opinions to call into doubt the accuracy
or trustworthiness of the business records and documents").  The Court also relies upon Fed. R.
Evid. 807, which provides that "a hearsay statement is not excluded by the rule against hearsay
even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 [where]
(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as
evidence of a material fact; (3) it is more probative on the point for which it is offered than any
other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will
best serve the purposes of these rules and the interests of justice."

**B. Existence of Arbitration Agreements**

While Plaintiffs have the burden of setting forth facts which call into question Defendants' entitlement to arbitration, Defendants must produce evidence of a valid arbitration agreement in the first instance. For this issue, the Court will determine whether Defendants have produced evidence of a valid arbitration agreement with the original party with whom they contracted for the extension of credit. Plaintiffs argue that Defendants have not submitted valid arbitration agreements for Ms. Cox and Mr. Mills.

*1. Ms. Cox*

Ms. Cox argues that Defendants have not submitted a cardholder agreement with an arbitration provision for Ms. Cox. [Filing No. 73 at 8-9.] Defendants respond that Ms. Cox has admitted that she used the credit card at issue, that the cardholder agreement provides that by using it she agreed to the terms of the cardholder agreement, and that the agreement contains an arbitration provision. [Filing No. 81 at 13.][6]

The Court agrees that, by using her credit card, Ms. Cox agreed to be bound by the terms of the cardholder agreement. But while Defendants have produced examples of HSBC's arbitration agreements, they have not produced the actual agreement referred to in the Cox Application, which identifies Household as the company issuing the credit card in any event. [Filing No. 81-6.] So, although the parties appear to agree that the cardholder agreement contained an arbitration provision, the Court cannot determine whether the arbitration provision applies to Ms. Cox's claims without analyzing the terms of the provision. Accordingly, because Defendants

---

[6] The Court afforded Defendants another opportunity to produce the arbitration agreement referred to in the Cox Application, [*see* Filing No. 83 at 2], but Defendants stated in response that they "are not able to produce a copy of the Cardholder Agreement and Disclosure Statement referenced in the [Cox Application] that was signed by Plaintiff Lucinda Cox," [Filing No. 86 at 3].

have not submitted the actual agreement that purportedly contains an arbitration provision for the Court's review, the Court denies Defendants' motion as it relates to Ms. Cox's claims. As noted, Ms. Cox is entitled to all reasonable inferences, and the absence of an agreement precludes the Court from compelling arbitration while applying the standard of review applicable here. A trier of fact may infer such a provision exists, but the Court is not free to do so.

*2. Mr. Mills*

Plaintiffs argue that Defendants have not shown which cardholder agreement applies to Mr. Mills because Synchrony Bank (formerly known as GE Capital Retail Bank) produced an agreement different from the Mills Agreement in response to a discovery request for all cardholder agreements relating to Mr. Mills, and that agreement contains a different arbitration provision. [Filing No. 73 at 14-15.] Defendants respond that the fact that the Mills Agreement is different than the agreement produced by Synchrony Bank is not relevant because both agreements contain "almost the exact same arbitration clause as the terms and conditions that govern [Mr.] Hartley's account." [Filing No. 81 at 10-11.]

Because of this discrepancy, the Court ordered Defendants to clarify which agreement supports assignment of Mr. Mills' account to CACH, or to advise the Court if they are unable to do so. [Filing No. 83 at 2.] Defendants then identified the agreement produced by Synchrony Bank as the correct cardholder agreement applying to Mr. Mills' account, and submitted it as an exhibit to sworn discovery responses from Martha Koehler, Manager of Litigation Support for Synchrony Bank. [Filing No. 81-4.] Plaintiffs responded to Defendants' supplemental filing by pointing out that Defendants argue the Coston Affidavit is reliable in the context of the other Plaintiffs' claims, yet the Coston Affidavit also identifies the Mills Agreement as the relevant agreement. Plaintiffs contend that Defendants "seem to pick which cardholder agreement is the

most believable and beneficial to their position without explaining why they know that the agreement produced by [Synchrony Bank] is finally the relevant agreement (and why they didn't know which agreement was the proper one until Plaintiffs pointed out the inconsistencies)." [Filing No. 87 at 6.]  Plaintiffs also note that Defendants have relied upon a sworn statement by another individual in a lawsuit brought by Defendants against Mr. Mills, in which that individual also "contend[ed] that a GE Retail Bank cardholder agreement [like the Mills Agreement] applied."  [Filing No. 87 at 6.]

The Court is concerned with the fact that Defendants have pointed to two different agreements to support their motion, and that Defendants do not attempt to explain why they initially relied upon the Mills Agreement but now believe the agreement produced by Synchrony Bank is the relevant agreement.  And, although both potentially-applicable agreements contain arbitration provisions, those provisions differ.  For example, the Mills Agreement applies to "us [defined as GE Capital Retail Bank], our affiliates, agents and/or dealers/merchants/retailers or participating professionals."  [Filing No. 48-5 at 49.]  The agreement produced by Synchrony Bank applies to "us," which is defined as "GE Money Bank and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors…."  [Filing No. 73-5 at 5.]  Differences in the provisions could be significant in terms of the scope of each provision, and the Court will not analyze the motion under both provisions.

In short, Defendants' supplemental filings do not alleviate the Court's concerns regarding Defendants' reliance on two different agreements at different points in the litigation.  The Court finds that a fact issue remains regarding which agreement applies to Mr. Mills and, consequently, whether the applicable agreement had a valid arbitration provision.  Because the Court finds that issues remain as to the existence of an arbitration provision within Mr. Mills' agreement,

Defendants are not entitled to an order compelling arbitration of Mr. Mills' claims on the basis of this record, though a trier of fact may ultimately conclude otherwise.[7]

### 3. Mr. Hartley and Mr. Brown

Plaintiffs do not argue that Defendants have failed to produce valid arbitration provisions relating to the accounts of Mr. Hartley[8] and Mr. Brown, and the Court finds that Defendants have sustained their burden of showing that potentially applicable arbitration agreements exist as to those two Plaintiffs. [*See* Filing No. 48-3 at 46; Filing No. 48-4 at 30.]

## C. Enforceability of Arbitration Agreements in Favor of CACH

Having found that Defendants have sustained their burden of showing a valid arbitration provision exists in the Hartley Agreement and the Brown Agreement, the Court now considers whether Defendants have shown that they are entitled to enforce those provisions. The Court notes at the outset that, while the parties focus on whether CACH can enforce the arbitration provisions, there are thirteen other defendants named in this lawsuit. Defendants argue that "the relationship between CACH, LLC and the other Defendants is sufficiently close that…[all] Defendants have a right to compel arbitration," detail the corporate relationships between various Defendants, set forth the individual Defendants' ties to the corporate Defendants, and note that "the Plaintiffs allege substantial concerted misconduct between…CACH, LLC…and the other Defendants." [Filing No. 53 at 14.] Plaintiffs do not contest the ability of Defendants other than CACH to

---

[7] Because the Court has concluded that Defendants have not sustained their burden of showing the existence of an arbitration agreement in either the Cox Application or the Mills Agreement, it will not consider whether CACH was entitled to enforce the purported agreements as an assignee.

[8] Plaintiffs belatedly argue for the first time in their supplemental response brief that the Hartley Agreement must not be the correct agreement because it is post-dated six months after Mr. Hartley opened his account. [Filing No. 87 at 7.] But the Court did not order or invite further briefing on Mr. Hartley's claims and, because Plaintiffs did not raise this argument in their initial response brief, the Court will not consider it now.

enforce the arbitration provision, arguing only that CACH does not have a right to do so. Accordingly, Plaintiffs have waived any contrary argument. The Court will analyze the issue in terms of CACH's ability to enforce the arbitration provisions, and will accept Defendants' contention that if CACH is entitled to arbitrate Mr. Hartley's and Mr. Brown's claims, then so are the other thirteen defendants. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present….Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief") (quotations and citations omitted).

### 1. *Mr. Hartley*

Defendants argue that the Hartley Agreement provides that GE may sell, assign or transfer any and all of its rights under the account agreement or the account. [Filing No. 53 at 10.] They also assert that the arbitration provision "explains that it includes GE and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, employees and directors," and that: (1) Plaintiffs are relying upon their cardholder agreements to sue Defendants, so cannot now repudiate the arbitration provisions; (2) "a non-signatory agent of a signatory party to an arbitration agreement may invoke the right to arbitrate"; (3) "a non-signatory may invoke the agreement when, under agency or related principles, the relationship between the signatory and non-signatory defendants is sufficiently close"; and (4) CACH is a third-party beneficiary of the cardholder agreements. [Filing No. 53 at 10-15.]

Plaintiffs argue generally that "it is highly likely that Plaintiffs' receivables would have been transferred" through the securitization process, so then CACH would not have been able to purchase Mr. Hartley's receivables under the GE Purchase Agreement. [Filing No. 73 at 4-6.]

They state that "[g]iven that most of GECC's receivables are securitized (and therefore likely sold), Defendants cannot prove that the two GE listed sellers [on the GE Purchase Agreement] had the right to sell the account." [Filing No. 73 at 21.] Plaintiffs also argue that, at best, CACH only purchased the "receivables" for Mr. Hartley's account, and not the actual account, and so "cannot show that they are entitled to take advantage of the agreement between [Mr.] Hartley and GE Money Bank." [Filing No. 73 at 22.] Plaintiffs also contend that CACH waived the right to arbitrate Mr. Hartley's claims, because they filed a collection action against him in state court. [Filing No. 73 at 23.]

On reply, Defendants argue that the Hartley Agreement applies to GE Money Bank's assigns, which include CACH. [Filing No. 81 at 2.] They assert that there is no case law to support Plaintiffs' argument that CACH only purchased "receivables," and not Mr. Hartley's actual account. [Filing No. 81 at 2.] Defendants call Plaintiffs' securitization argument "speculative," and further note that the securitization theory has been rejected by many courts. [Filing No. 81 at 2-4.] Defendants contend that issues regarding CACH's assignment should be decided by an arbitrator, and that Defendants have not waived the right to arbitrate because this matter involves claims distinct from the claims at issue in the state court collection action. [Filing No. 81 at 5-7.]

The GE Purchase Agreement is between CACH as the buyer, and GECC and GE Money Bank as sellers. [Filing No. 48-3 at 2.] The arbitration provision in the Hartley Agreement applies to "GE Money Bank and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors." [Filing No. 48-3 at 46.] The Hartley Agreement also provides that GE Money Bank may "sell, assign or transfer any of our rights or obligations under this Agreement or your Account, including our rights to payments, without prior notice to you." [Filing No. 48-3 at 43.] Accordingly, based on its plain language, the GE Purchase

Agreement and the Hartley Agreement gave CACH the rights under the Hartley Agreement, which include the right to arbitrate Mr. Hartley's claims. Utah law, which governs the Mills Agreement, also provides that "an assignee stands in the shoes of its assignor….[T]he purpose behind the rule is that an assignee has rights and liabilities identical to those of its assignor." *CCAM Enterprises, LLC v. Department of Commerce, Div. of Occupational and Professional Licensing*, 324 P.3d 648, 650 (Utah Ct. App. 2014). So, while the plain language of the GE Purchase Agreement and Utah law indicate that CACH could enforce the arbitration provision as an assignee, the Court will consider whether any of Plaintiffs' arguments dictate against that conclusion.

### a. Securitization

Plaintiffs' main argument regarding the ownership of Mr. Hartley's account is that, although Mr. Hartley entered into the Hartley Agreement with GE Money Bank and GE Money Bank is a party to the GE Purchase Agreement that Defendants rely upon to show that ownership transferred to CACH, there is an incomplete chain of title because "the majority of receivables of [GECC] and its subsidiaries' receivables…are securitized, or sold to RFS Holding, Inc. and then to a master trust." [Filing No. 73 at 21.] Accordingly, Plaintiffs argue, "Defendants cannot prove that the two GE listed sellers had the right to sell the account." [Filing No. 73 at 21.] Plaintiffs rely upon the Affidavit of Eugene Zoellner, a Certified Public Accountant, who explains that securitization is "the process whereby loans or other receivables are packaged, underwritten and sold to investors." [Filing No. 73-2 at 4.] Mr. Zoellner testifies that, for 2010, approximately 63% of GECC's consumer financing receivables constitute credit card receivables "held by variable interest entities that are consolidated and included in the statement of financial position of GECC," and that the credit card receivables have been securitized. [Filing No. 73-2 at 3.] Plaintiffs extrapolate from the Zoellner Affidavit to argue that "it is highly likely that Plaintiffs' receivables

would have been transferred as well" – meaning that GE Money Bank would not have had the right to sell Plaintiffs' accounts to CACH. [Filing No. 73 at 6.]

Plaintiffs' securitization theory is based on sheer speculation. Indeed, Mr. Zoellner does not mention Mr. Hartley's account in his Affidavit at all, and he – and Plaintiffs – can only speculate as to whether the account had been securitized prior to the GE Purchase Agreement. The Court finds that this speculation is not enough to cast doubt on whether Defendants are entitled to enforce the arbitration provision in the Hartley Agreement based on the documents Defendants have submitted. *See Tinder*, 305 F.3d at 735 (party opposing arbitration must "identify specific evidence in the record demonstrating a material factual dispute for trial").

The Court also notes that several other courts have rejected the notion that securitization changes the creditor's ability to enforce its interest in accounts, even where its interest in the receivables is sold. *See, e.g.*, *Tostado v. Citibank (S. Dakota), N.A.*, 2010 WL 55976, *2-3 (W.D. Tex. 2010)* (the "real party in interest, Citibank, would hold the right to enforce its interests on those accounts and loans" even though it had sold its interest in the receivables through securitization); *Lane v. Vitek Real Estate Industries Group*, 713 F.Supp.2d 1092, 1099 (E.D. Cal. 2010) ("The argument that parties lose their interest in a loan when it is assigned to a trust pool has also been rejected by many district courts"). These interests include the ability to sell the account. *See, e.g.*, *Rivac v. Ndex West LLC*, 2013 WL 6662762, *4 (N.D. Cal. 2013)* ("The power of sale is not nullified when a loan is securitized"); *Scott v. Bank of America*, 2013 WL 6164276, *3 (E.D. Pa. 2013)* ("[S]ecuritizing receivables has no impact on the relationship between the debtor and the creditor").

Both the speculative nature of Plaintiffs' securitization argument, and the lack of citation to case law supporting that argument, lead the Court to reject the securitization theory.

### b. Receivables Versus Accounts

Plaintiffs argue that CACH purchased only a receivable, not an account, under the GE Purchase Agreement. [Filing No. 73 at 21-22.] Accordingly, they argue, CACH did not purchase any of the rights in the Hartley Agreement, including the right to arbitrate claims. [Filing No. 73 at 22.]

Plaintiffs have not cited any authority for their proposition that a purchaser of account receivables is not entitled to the rights in the account agreement. To the contrary, this argument has been rejected by numerous courts. *See, e.g.*, *Nat'l City Bank, Northwest v. Columbian Mut. Life Ins. Co.*, 282 F.3d 407, 409 (6th Cir. 2002) (assignee of contract with right to accounts receivable receives benefit of all rights under original contract); *Oxford Commercial Funding, LLC v. Cargill, Inc.*, 2002 WL 31455989, *3 (N.D. Ill. 2002) ("In cases addressing the assignment of accounts receivables, courts have held that the assignee 'stands in the shoes of the assignor'" and even when the party is "only assigned the right to the payments" any provisions that were part of the contract from which the assignee's accounts receivables were created are enforceable); *GMAC Commercial Credit LLC v. Springs Industries, Inc.*, 171 F.Supp.2d 209, 214 (S.D.N.Y. 2001) ("[G]eneral assignments [of a contract] confer both the assignor's rights and obligations to the assignee"). The Court rejects Plaintiffs' argument that the sale of receivables somehow limited CACH's right to enforce all of the terms of the Hartley Agreement.

### c. Waiver

Plaintiffs argue that Defendants have waived the right to arbitrate Mr. Hartley's claims because they initiated a state court collection proceeding against him. [Filing No. 73 at 23.] Defendants respond that the claims at issue in this lawsuit are distinct from CACH's claims in the state court collection action, so there was no waiver. [Filing No. 81 at 6-7.]

Utah law recognizes waiver of an arbitration provision where the party opposing arbitration can show: "(1) that the party seeking arbitration substantially participated in the underlying litigation to a point inconsistent with the intent to arbitrate; and (2) that this participation resulted in prejudice to the opposing party." *Educators Mut. Ins. Ass'n v. Evans*, 258 P.3d 598, 613 (Utah Ct. App. 2011). Plaintiffs have not cited any case law indicating that a party to an arbitration provision waives the provision by initiating a lawsuit involving different claims than the claims it seeks to arbitrate. Indeed, the only cases Plaintiffs point to involve seeking arbitration of the same claims after an unfavorable litigation result, *see St. Mary's Medical Center of Evansville, Inc. v. Disco Aluminum Products Co., Inc.*, 969 F.2d 585, 589 (7th Cir. 1992), or seeking arbitration of claims after substantial participation in a lawsuit involving those same claims, *see Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995). Neither is the case here, where Defendants seek to arbitrate FDCPA and RICO claims brought by Mr. Hartley, and not its own claims related to collection of the debt that are the subject of the state court proceeding.

In sum, the Court rejects each of Plaintiffs' contrary arguments and finds that Defendants have produced sufficient evidence to show that CACH purchased the right to arbitrate Mr. Hartley's claims under the Hartley Agreement. Accordingly, the Court finds that Defendants are entitled to arbitrate Mr. Hartley's claims.

   *2. Mr. Brown*

Defendants advance many of the same arguments they made related to Mr. Hartley's claims to support their argument that CACH is entitled to enforce the arbitration provision in the Brown Agreement – including that Mr. Brown cannot rely on the Brown Agreement for his benefit (*i.e.*, to sue Defendants) but repudiate the arbitration provision, and that CACH is entitled to the same rights as the assigning party. [Filing No. 53 at 11-15.]

Plaintiffs respond by arguing that the Beneficial Account Purchase Agreement does not mention Beneficial Indiana at all, but only Beneficial Company LLC, HFC Company LLC, their subsidiaries, and HSBC Consumer Lending (USA) Inc. as managing company for those entities. [Filing No. 73 at 12-13.] Plaintiffs contend that the bill of sale transferring Mr. Brown's account to CACH "mentions the same companies as the purchase agreement, but does not mention Beneficial Indiana, Inc. nor does it explain how any of the companies listed are related to Beneficial Indiana, Inc." [Filing No. 73 at 13.] Plaintiffs also assert that there is no language in the Brown Agreement implying that the right to arbitrate can be transferred or assigned. [Filing No. 73 at 13.]

Defendants argue in reply that the Brown Agreement need not specifically provide that the right to arbitrate can be assigned, and that an assignee steps into the shoes of the assignor and possesses the same rights as the assignor subject to the same defenses the debtor may have had against the assignor. [Filing No. 81 at 11-12.] Defendants also assert that Beneficial Indiana is a wholly-owned subsidiary of HSBC. [Filing No. 81 at 12.]

Defendants have submitted evidence that Beneficial Indiana is a subsidiary of HSBC Finance Corp. [*See* Filing No. 81-5 at 3.] But HSBC Finance Corp. is not a party to the Beneficial Account Purchase Agreement – only Beneficial Company LLC, HFC Company LLC, their respective subsidiaries, and HSBC Consumer Lending (USA) Inc. as managing company for those entities are. In response to the Court's Order requiring Defendants to produce evidence (to the extent it exists) of Beneficial Indiana's relationship to any of the entities that are parties to the Beneficial Account Purchase Agreement, Defendants submitted a corporate disclosure statement filed in another case in July 2008, which lists Beneficial Indiana as a subsidiary of Beneficial Company LLC. [Filing No. 86-1.]

The Court must respect the organizational form, and the July 2008 corporate disclosure is not sufficient to show that debt resulting from the Brown Agreement was transferred under the Beneficial Account Purchase Agreement from Beneficial Indiana to CACH.  *See, e.g.*, *CBR Event Decorators, Inc. v. Gates*, 962 N.E.2d 1276, 1282 (Ind. Ct. App. 2012) ("Courts are reluctant to disregard [organizational form]"); *Winkler v. V.G. Reed & Sons*, 638 N.E.2d 1228, 1232 (Ind. Ct. App. 1994) (same principle); *see also Boulder Acquisition Corp. v. Unemployment Ins. Appeals of the Ind. Dep't of Workforce Dev.*, 976 N.E.2d 1282, 1284 (Ind. Ct. App. 2012) ("[E]ach subsidiary is an individual legal entity….As such, they have their own governance, board of directors or managers, and elected officers.  They each have their own assets and liabilities.  They are each taxed separately…and they each maintain separate financial reporting").  The corporate disclosure statement simply shows that Beneficial Indiana's counsel represented that in 2008 it was a subsidiary of Beneficial Company LLC.  But the Beneficial Account Purchase Agreement was entered into in September 2010, [Filing No. 48-4 at 2], and a corporate disclosure statement filed two years earlier in another case is not enough to show Beneficial Indiana's corporate status two years later.  Defendants have not sustained their burden of showing a clear chain of title for Mr. Brown's account from Beneficial Indiana to CACH.  Accordingly, factual issues remain which compel the Court to reject Defendants' argument that they are entitled to arbitrate Mr. Brown's claims as purchasers under the Beneficial Account Purchase Agreement on the basis of the present record.[9]

---

[9] Because Defendants have not shown that Beneficial Indiana was a party to the Beneficial Account Purchase Agreement and, therefore, that Beneficial Indiana could sell rights to its accounts under that Agreement, the Court need not consider Defendants' other arguments regarding assignment of rights – to the extent the Court has not already considered them in connection with Mr. Hartley.

### D. Effect of This Ruling on the Future of the Litigation

The Court notes that in opposing Defendants' Motion to Compel Arbitration, Plaintiffs have essentially argued the merits of some of their claims by asserting that Defendants did not own their debts. [*See* Filing No. 1 at 30-33 (Count III, asserting claims for failure to own their debts in violation of the FDCPA, and Count IV, for common law fraud for representing that CACH legally owned Plaintiffs' debts).] As discussed above, the Court has found that CACH purchased the right to arbitrate Mr. Hartley's claims, by purchasing his debts. Accordingly, Plaintiffs and their counsel should evaluate whether Counts III and IV against Mr. Hartley, or any other claims, are precluded by these findings, and should do so while being mindful of Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.

As to the claims asserted by Ms. Cox, Mr. Mills, and Mr. Brown, the Court has found that factual issues remain regarding whether Defendants are entitled to arbitrate their claims. Rather than proceed to a trial on the merits, the Court must first hold a trial regarding Defendants' right to arbitrate Plaintiffs' claims. *See, e.g.*, *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978-79 (10th Cir. 2014) ("One thing the district court may never do is find a material dispute of fact *does* exist [in connection with a motion to compel arbitration] and then proceed to *deny* any trial to resolve that dispute of fact. That's like mixing apples and oranges, like saying someone who fails to win a summary judgment motion must necessarily lose after trial. It confuses the very different roles summary judgment and trial serve in our legal order. Having found unresolved questions of material fact precluded it from deciding definitely whether the parties agreed to arbitrate, the district court was in no position to *deny* a motion to arbitrate. It *had* to move promptly to trial of the unresolved factual questions surrounding the parties' claimed agreement to arbitrate") (emphasis in original); *see also* 9 U.S.C. § 4 (where a party petitions the Court for an

order compelling arbitration, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default…the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may… demand a jury trial of such issue…."); *Yearwood v. New York and Presbyterian Hosp.*, 2014 WL 1651942, *7 (S.D. N.Y. 2014) ("if there is a material issue of fact in dispute as to 'the making of the agreement for arbitration or the failure to comply therewith,' a court must deny the motion and hold a trial on the issue"); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1196 (7th Cir. 1987) (parties entitled to jury trial on issue of arbitrability "if there is a triable issue concerning the existence or scope of the [arbitration] agreement").

### E.  John Doe Defendants

Finally, Plaintiffs name as defendants "John Does 1-50." [*See* Filing No. 1.] The Seventh Circuit Court of Appeals disfavors suing John Doe defendants in federal court, and has stated that "it is pointless to include lists of anonymous defendants in federal court; this type of placeholder does not open the door to relation back under Fed. R. Civ. P. 15, nor can it otherwise help the plaintiff." *Wudtke v. Davel*, 128 F.3d 1057, 1060 (7th Cir. 1997) (internal citations omitted). Accordingly, the Court dismisses Defendants John Does 1-50 from this lawsuit

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Defendants' Joint Motion to Compel Arbitration and Stay Proceedings Pending the Completion of Arbitration, [Filing No. 34], as to claims brought by Mr. Hartley. Claims brought by Mr. Hartley will be **STAYED** pending completion of arbitration. The parties shall file a Report with the Court within seven days of completion of Mr. Hartley's arbitration.

The Court **DENIES IN PART DUE TO FACTUAL DISPUTES** the motion as to claims brought by Ms. Cox, Mr. Mills, and Mr. Brown. The issue of whether Defendants are entitled to arbitrate claims brought by Ms. Cox, Mr. Mills, and Mr. Brown will be determined in a summary trial. **The Court requests that the Magistrate Judge confer with the parties as soon as practicable** to set a schedule for expedited discovery on the issue of arbitrability (if any additional discovery is needed) and for trial on that issue, and to discuss whether Plaintiffs demand a jury for trial on the issue of arbitrability.

Additionally, after reviewing the pending motion and noting the fact-specific nature of each Plaintiff's claims and the fact that different cardholder agreements govern each Plaintiff's account and, in most cases, different agreements govern CACH's acquisition of rights to those accounts, the Court **ORDERS** Plaintiffs to **SHOW CAUSE** by **February 27, 2015** why the Plaintiffs' claims should be joined in this single lawsuit. In responding to the Order to Show Cause, Plaintiffs must address Fed. R. Civ. P. 20, which provides that "[p]ersons may join in one action as plaintiffs if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." Plaintiffs must also address how staying the claims of Mr. Hartley, and allowing the claims of Ms. Cox, Mr. Mills, and Mr. Brown to proceed to trial on the issue of arbitrability, affects the propriety of joinder.

Finally, the Court **DISMISSES** Defendants John Does 1-50 from this lawsuit, and the Clerk is directed to terminate them as parties.

**Date**: February 13, 2015

_Jane Magnus-Stinson_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**